# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00322-CV

---

**L.C., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 317,282, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

The trial court terminated L.C.'s (Mother) parental rights to two children after finding multiple predicate grounds and finding that termination was in the children's best interest. *See* Tex. Fam. Code §§ 161.001(b)(1)(D), (E), (N), (O) (grounds for termination), (2) (best interest). Mother contends that termination was not supported by sufficient evidence. She contends that undisputed evidence showed that she visited the children regularly and could provide a safe environment for them. She argues that the Texas Department of Family and Protective Services (Department) made no efforts to return the children. Mother contends that she complied with the service plan even when not ordered to do so, she neither created a danger to the children nor allowed them to remain in dangerous surroundings, and that her drug use was not shown to have affected her children. She also argues that the evidence was insufficient to overcome the presumption that return to her is in the children's best interest. We will affirm the judgment.

## BACKGROUND

This case concerns Mother's parental rights to two children—a twelve-year-old and a five-year-old.[1] The Department's Kayla Magee testified that she had been the conservatorship worker since June 2023. She testified that the children had been in the Department's care since May 6, 2020, after the older child reported domestic violence by Mother's boyfriend against Mother. The removal led to the discovery that Mother was an active methamphetamine user. The children were initially placed with their grandmother (Grandmother). Mother's access to the children was supposed to be supervised by the Department, but Grandmother allowed her to stay overnight. One night, Mother's boyfriend (who was accused of domestic violence against Mother), broke into Grandmother's home and stole Mother's phone. The children were removed from Grandmother because she had permitted unsupervised contact between the children and Mother. The children were placed with fictive kin, then moved to another foster home because the fictive kin could not be a long-term placement. They were discharged from that home because the second foster home could not manage the children's behavior. The children then moved to their current placement.

Magee testified that in April 2022 the Department shifted its intention to termination because Mother tested positive again for methamphetamine use. In October 2022, Mother tested positive for methamphetamine use again while pregnant.[2] Magee testified that

---

[1] The Department was unable to locate the children's fathers or the fathers' families. Mother said the father of the younger child was never involved in the child's life and the father of the older child had last been in contact eight years earlier when the child was four. The fathers' parental rights were terminated; those terminations are not part of this appeal.

[2] The child with whom Mother was pregnant in October 2022 was one year old at the time of the trial below and was the subject of a Department case in Collin County, Texas. The Department sought termination of Mother's rights to that child in Collin County.

Mother was incarcerated in Collin County, Texas, based on a violation of parole imposed for the crime of possession of a controlled substance in 2020.

Magee testified that Mother was allowed four-hour visits once a month supervised by the Department. Mother attended these visits in-person. She fell asleep during two visits; she asserted that she had narcolepsy but never provided medical records supporting that claim. She was not allowed to visit other times because she tested positive for use of amphetamine and methamphetamine. During allowed visits, she acted appropriately.

Mother successfully completed counseling and parenting classes in August 2023 but tested positive for methamphetamine use in October 2023. Magee testified that, as a result of the October 2023 positive test, Mother was asked to participate in counseling and Alcoholics Anonymous and Narcotics Anonymous, but she declined to participate and did not say why. Mother did not participate in weekly drug testing and did not attend all of her court hearings in Collin County. Magee testified that Mother turned herself in to the Collin County jail on January 19, 2024, for an unspecified "parole"[3] violation and was placed into a drug-rehabilitation program for a minimum of 120 days. Mother came to the last permanency hearing before trial but had not attended previous permanency hearings or the trial below; the latter was due to her incarceration.

Magee testified that she was concerned by Grandmother's support for Mother. Magee testified that Mother had moved in with Grandmother after being evicted from an apartment.

Magee testified that she did not believe that Mother could provide a safe and stable home for the children because she had not shown an ability to do so. Magee testified that

---

[3] The Department's attorney described this as a probation violation.

the Department was concerned that Mother would continue to abuse drugs because she had continued to do so during the pendency of the case—even when pregnant. Magee testified that continued drug use would endanger the children through neglectful supervision and possible contact with the drugs. Magee also testified that Mother was unable to complete other visits because her "instant test" was positive for amphetamine and methamphetamine. Magee testified that Mother had made no behavioral changes since the children were taken into the Department's care. Magee said she was not able to say that drug rehab would help alleviate concerns about Mother's drug use because previous rehab stints had not deterred her from using illegal substances. Magee testified that Mother continued to use drugs and alcohol during the fall of 2023, when she was placed on an ankle monitor because of her drug-and-alcohol use. Magee testified that previous caseworkers reported that Mother had also gotten into domestic disputes with a girlfriend.

Magee recommended termination of Mother's parental rights because Mother was not able to provide a safe and stable environment free of drug use and criminal activity. Magee testified that termination would be in the children's best interest and that the Department planned for adoption by the children's current foster placement. Magee testified that the Department had exhausted all efforts to place the children with Mother and that Mother had not done her part in making sure she was safe for her children. Magee testified that the children had been in limbo for four years; the limbo had negatively affected the older child because she was uncertain whether she was "going to go home." Magee testified that the children were doing really well in their current placement and that the elder child was exceling in school despite her previous upheaval. She testified that the younger child did not know Mother as his mother.

4

Magee testified that the children "would like to go back to their grandmother, but they understand that she's not going to be able to provide a safe environment due to her support of the mother." She said that the older child has accepted that being placed with Grandmother is not likely. Magee testified that children would be able to continue their relationship with Grandmother because the foster parents are "very open" with Mother's family and took them to visit. They both knew Grandmother and had spoken with her on the phone and in video chats.

Kristi Paulsen testified that, as the children's guardian ad litem for a year and a half, she had visited the children multiple times. Paulsen said she had spoken to the older child specifically about the possibility of termination of Mother's rights and the child said her first wish was to be placed with Grandmother; absent that, the child agreed to be adopted—meaning Mother's rights would be terminated. Paulsen said the child had never expressed to her a desire to return to Mother. Paulsen's concern with placement with Grandmother was the incident when Grandmother allowed Mother to stay in the home and the possibility of Mother's history of drug use causing a safety issue. Paulsen said she did not think a court order or safety plan could alleviate her concern. Paulsen testified that she had observed two visits with Mother during which Mother was appropriate with the children and did not fall asleep. Paulsen testified that the older child had "been very up and down with her emotions in regard to Mom trying to do well and then falling off testing positive." She testified that the children were "very bonded" to their current caregivers. They get lots of experiences and activities, the older child was doing very well in school, and they get to maintain family contact. Paulsen said she believed the family contact would continue even after adoption by the placement.

The foster mother, B.P., testified that the children had been placed with her and her husband since January 27, 2023. They had done video calls, phone calls, text messages, and

in-person visits with Mother's family members for the older child's birthday and at Christmas. B.P. said that she has weekly contact with Grandmother and would like to plan on spending a weekend per month with those relatives because the relationship is very important to the older child. B.P. had met Mother, who was allowed to attend the birthday party, but contact with Mother was very on and off. B.P. also testified that the older child said she would like to live with Grandmother but, if that was not an option, to be adopted by B.P. and her husband. B.P. testified that she was not opposed to Mother having a relationship with the children if she remained sober. B.P. testified that, after adoption, she would need to build trust through supervised visitations with Mother. She testified that Grandmother had apologized to the older child for not prioritizing them above Mother and supports the children's staying with B.P. and her husband.

Mother did not appear at the trial. The court stated that it understood "that she did not want to participate today." She was represented by an attorney who made opening and closing statements, objected to an exhibit, and called and examined witnesses. Her attorney stated that he had discussed the possible outcomes for the case with Mother. He also stated that Mother had not wanted to be bench-warranted for a previous trial setting and, for this trial, "just asked that I appear on her behalf and argue against termination."

## APPLICABLE LAW

To terminate the parent-child relationship, a court must find by clear and convincing evidence that (1) the parent has committed one of the enumerated statutory grounds for termination and (2) it is in the child's best interest to terminate the parent's rights. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will

6

produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When evaluating legal sufficiency of the evidence, we consider whether, when the evidence is viewed in the light most favorable to the factfinder's determination and undisputed contrary evidence is considered, "a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. When evaluating factual sufficiency of the evidence, we consider whether "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see also In re P.A.C.*, 498 S.W.3d 210, 214 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.* Accordingly, an appellate court must not substitute its own judgment for that of the jury, *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024) (per curiam). Jurors "may choose to believe one witness and disbelieve

7

another," and we "cannot impose [our] own opinions to the contrary." *In re C.E.*, 687 S.W.3d at 309 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005)).

## DISCUSSION

In four issues, Mother challenges the finding that the record supports termination of her parental rights on Subsection (D), (E), (N), and (O) statutory grounds. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (N) (constructive abandonment), (O) (failing to comply with court-ordered family service plan). By her fifth issue, Mother contends that the evidence is insufficient to overcome the presumption that termination is not in the children's best interest. *See id.* § 161.001(b)(2).

## I.     Grounds for termination

We will focus on the challenges to Subsection (E) because that finding may have additional consequences for Mother in future proceedings. *See* Tex. Fam. Code § 161.001(b)(1)(E); *In re R.R.A.*, 687 S.W.3d 269, 279 (Tex. 2024); *J. B. M. H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *8 (Tex. App.—Austin Apr. 13, 2023, pet. denied) (mem. op.) (court need review only ground (D) or (E)).

Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam) (quoting Tex. Fam. Code § 161.001(b)(1)(E)). When considering whether clear and convincing evidence supports Subsection (E) grounds, our analysis focuses on whether the child's environment or the parent's conduct is "endangering"—that is, exposes the child to loss

8

or injury. *In re J.W.*, 645 S.W.3d 726, 748 (2022) (citing *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Boyd*, 727 S.W.2d at 533); *see also A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied).

Under Subsection (E), "the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act." *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied); *see also S.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00142-CV, 2021 WL 3437891, at *1 (Tex. App.—Austin Aug. 6, 2021, no pet.) (mem. op.). "Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *C.B.*, 458 S.W.3d at 582. "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (quoting *In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) (citation omitted)). Illegal drug use may support termination under Subsection 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent

9

engaged in conduct that endangered the child's physical or emotional well-being. *Id.* at 265. "Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E)." *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied). If the imprisonment of the parent displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct that endangers the child. *Walker v. Texas Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A parent's refusal to submit to drug tests permits the trial court to presume that the drug test would have been positive. *See In re J.W.*, 645 S.W.3d 726, 724 (Tex. 2022).

Mother contends that the evidence supporting termination under Subsection (E) was insufficient because there was no evidence that the children were endangered by Mother's drug use. She cites our holding that a finding of endangerment based on drug use alone is not automatic. *See D.H. v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 61-62 (Tex. App.—Austin 2021, no pet.). She contends that termination is a fact-specific determination, citing a case in which "Father's use of methamphetamines on two occasions, standing alone, does not rise to the level of a conscious course of conduct" sufficient to warrant termination under Subsection (E). *See In re C.V.L.*, 591 S.W.3d at 752. Mother argues in this case that there were a few positive drug tests, a lot of clean tests, and no evidence that Mother used drugs around the children or allowed the children to be around drug users.

But this is not a circumstance of a few positive drug tests. Mother was convicted of possession of a controlled substance in 2020, then violated her community supervision and went to jail. She knew that she was on supervision and knew that her parental rights hung in the balance, and yet she used methamphetamine and drank alcohol in conflict with the terms of her

10

service plan. In April 2022, July 2022, and October 2022, Mother tested positive for use of amphetamines, methamphetamine, and marijuana—the October 2022 positive test occurred while she was pregnant. She also tested positive in Collin County for methamphetamines and amphetamines on October 17, 2023, and October 31, 2023. She further tested positive in Collin County for alcohol on August 31, 2023; September 6, 2023; September 28, 2023; October 11, 2023; and October 17, 2023. She also missed more than fifty tests, which allows the factfinder to reasonably infer that she was avoiding testing because she was using illegal drugs. *See In re E.R.W.*, 528 S.W.3d at 265.

Additionally, one night while Mother was staying at Grandmother's house with the children without the required Departmental supervision, Mother's boyfriend—who was an alleged perpetrator of domestic violence on Mother—broke into the house and stole Mother's telephone. While Mother is not responsible for the actions of her boyfriend, her unauthorized presence in Grandmother's house exposed the children to criminality. Mother also fell asleep during supervised visits with the children; while the supervision ameliorated danger to the children during the visits, falling asleep during the visit raised concerns about the safety of the children if left in her unsupervised care.

Viewing all the evidence under the applicable standards of review, we must conclude that it was legally and factually sufficient to support the endangerment findings against Mother. *See* Tex. Fam. Code § 161.001(b)(1)(E); *In re A.C.*, 560 S.W.3d at 630-31. We overrule issues challenging termination under Subsection (E) and do not need to address her issues one and two challenging the evidence supporting the (D), (N), or (O) statutory grounds. *See In re N.G.*, 577 S.W.3d at 232-33; *see also* Tex. R. App. P. 47.1 (providing that court must

11

write opinion as brief as practicable but that addresses every issue raised and necessary to final disposition of appeal).

## II.  Best interest of the children

By her fifth issue on appeal, Mother contends that the Department failed to carry its burden to prove that termination was in the children's best interest. She leans on "the strong presumption that the best interest of a minor is usually served by keeping custody in the natural parents." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). She contends that she was unable to take possession of the children at the time of trial only because she was enrolled in a drug rehabilitation program. She contends that she could provide a safe environment for the children at Grandmother's home, which was the children's preferred home and with whom the foster parents have maintained and plan to continue to maintain a relationship for the children. The children were removed from Grandmother because she allowed Mother to stay there with the children without supervision, and that combination was not a risk while Mother was in rehab.

Factors commonly used in assessing the child's best interest include: (1) the child's desires, (2) the emotional and physical needs of the child now and in the future, (3) any emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist those individuals to promote the best interest of the child, (6) the plans for the child by those individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); *Leal v. Texas Dep't of Protective & Regul. Servs.*, 25 S.W.3d 315, 321 (Tex.

12

App.—Austin 2000, no pet.). This is not an exhaustive list, and other appropriate factors may be considered. *Holley*, 544 S.W.2d at 372. No one factor is controlling, and the facts of a case may mean that evidence of one factor is sufficient to support a finding that termination is in the children's best interests. *A. D. v. Texas Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 716 (Tex. App.—Austin 2023, no pet.). The absence of some factors does not prevent the jury from finding by clear and convincing evidence that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27. However, the best-interest standard does not permit termination merely because a child might be better off living elsewhere. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.).

The strong presumption that a child's best interest is served by keeping the child with his or her biological parents disappears when confronted with evidence to the contrary. *In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.—San Antonio 2003, no pet.); *see also Y. M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00707-CV, 2024 WL 1540264, at *10 (Tex. App.—Austin Apr. 10, 2024, no pet.) (mem. op.). Evidence proving one or more statutory grounds for termination also can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

There was no evidence that the children wanted to live with Mother; the only evidence was that the older child preferred to live with Grandmother but understood that Grandmother would not be able to provide a safe environment because of her support for Mother. The older child's second preference was to be adopted by her foster parents. Though there was no evidence that Mother's continued drug use occurred in the children's presence, it created instability and uncertainty in the children's lives. They were removed from Mother's care, then removed from Grandmother's care because Mother violated the supervision

requirement for her visits. Supervised visits were canceled on the day of the visit because Mother tested positive for drug use. When visits occurred, Mother occasionally fell asleep. Though Mother had completed counseling, she continued to use drugs and alcohol knowing that her freedom and parental rights were threatened. The disruption to the children's placement had lasted so long that the five-year-old child did not know Mother as his mother. The children were bonded to their foster parents and the older child was doing well in school. The foster parents intended to adopt the children if the parental rights to the children were terminated. The foster parents had maintained and intended to continue to maintain the children's relationship with their maternal family—including Mother if she could build and maintain the foster parents' trust.

Viewing the evidence in the proper light, we conclude that the evidence is legal and factually sufficient to permit the trial court to form a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. We overrule Mother's fifth appellate issue.

## CONCLUSION

We affirm the judgment.

_____
Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: October 3, 2024

14